**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CASE NO.**  4:16-cv-902 |
| | § | |
| **MATTHEW CARL GRIFFIN and** | § | |
| **WILLIAM DANIEL GRIFFIN,** | § | |
| | § | |
| **Defendants.** | § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Matthew Carl Griffin and William Daniel Griffin (collectively, "Defendants" or "the Griffins"), respectfully alleging the following:

### I.
### SUMMARY

1.      Between November 2013 and July 2014, Matthew Carl Griffin and his brother, William Daniel Griffin, directly and through Matthew Griffin's company Payson Petroleum, Inc. ("Payson"), conducted a two-phase offering of interests in two limited partnerships to develop three oil and gas wells (the "3 Well Program").  The Griffins made materially false and misleading statements and omissions to potential and actual investors, raising $23 million from approximately 150 investors across the country.

2.      Specifically, the Griffins misled the investors:

- By misrepresenting that Payson would contribute 20% of the offering amount, or $5.4 million, and that this capital infusion would cover 20% of the drilling and completion cost of the wells;

- By failing to disclose that Payson lacked the financial means to make the $5.4 million payment;

- By failing to disclose that Payson would treat the $23 million in offering proceeds it raised as its "turn-key" fee (that it would keep), regardless of the actual cost of the wells, while mischaracterizing the cost of the wells as an "estimate" rather than a fixed cost;

- By misrepresenting that Payson had raised the projected $27 million Payson represented to investors was necessary to pay for the 3 Well Program ($24 million to drill and complete the wells and $3 million in marketing and administrative costs); and

- By representing that Payson would cover any cost overages, beyond the estimated $24 million to drill and complete the wells, without disclosing that Payson lacked the financial means to pay overages.

3.      Payson lacked the means to make the $5.4 million payment and, in fact, contributed no money to the 3 Well Program.  Consequently, Payson paid no portion of its 20% share of the well costs.  Payson also lacked the means to pay any cost overages.

4.      Moreover, Payson did not raise the $27 million it claimed was required.  It raised only $23 million, all of it from investors.

5.      Without informing the investors about any turn-key arrangement, and without specifying what consideration would flow to Payson for operating the 3 Well Program, the Griffins treated as Payson's fee the difference between its claimed, but undisclosed, $24 million turn-key entitlement and the wells' actual $16 - $18 million cost.

6.      This conduct, alleged in further detail below, violated the federal securities laws, and the Commission requests a judgment against Defendants, permanently enjoining them from violating the antifraud provisions of the Securities Act of 1933 (the "Securities Act") and the Securities and Exchange Act of 1934 (the "Exchange Act"), and ordering them to pay disgorgement with prejudgment interest and civil penalties.

**II.**
**JURISDICTION AND VENUE**

7.      Defendants offered and sold units in a two-phase offering of partnership interests for the purpose of funding the drilling and completion of two vertical wells and one horizontal well in Grayson County, Texas (i.e., the 3 Well Program).  As described in more detail below, these investments constituted securities or investment contracts under Section 2(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

8.      The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks the imposition of civil penalties pursuant to Section 20(d)(2)(C) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3)(B)(iii) of the Exchange Act [15 U.S.C. §§ 78u(d)]. This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa] because Defendants directly or indirectly made use of the means or instrumentalities of commerce and/or the mails in connection with the transactions described herein.

9.      Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of Defendants' acts, practices, transactions, and courses of business alleged herein occurred within this judicial district.

### III.
### PARTIES

10.     Matthew Carl Griffin ("M. Griffin"), age 39, of Flower Mound, Texas, the founder of Payson, was at all relevant times Payson's sole owner, president, CEO, and chairman. From 2005 to 2007, M. Griffin worked as a registered representative with the SEC-registered broker-dealer Lone Star Securities, Inc., where he pitched private oil and gas securities offerings. Payson, based in Bartonville, Texas, commenced operations in 2011.

11.     William Daniel Griffin ("W. Griffin"), age 50, of Argyle, Texas, was at all relevant times Payson's Chief Administrative Officer and a member of Payson's board of directors.  In January 2016, W. Griffin relinquished those positions and became Payson's vice president of capital markets.  In October 2001, W. Griffin co-founded and then operated an oil and gas development company, Red Rock Drilling, LLC and its affiliate Red Rock Energy Partners, Ltd..  On August 1, 2016, W. Griffin filed a petition for Chapter 7 personal bankruptcy in the U.S. District Court for the Eastern District of Texas.

### IV.
### FACTS

**A.     PAYSON PETROLEUM'S BEGINNINGS.**

12.     M. Griffin incorporated Payson in 2008.  He was responsible for the actions of the company, and Payson acted through him.  W. Griffin served on Payson's board of directors and also acted, from late 2012, as Payson's Chief Administrative Officer, working in concert with M. Griffin in directing Payson's actions.

13.     In 2010, M. Griffin formed the limited liability company Payson Operating, LLC ("Payson Operating").  Payson was the sole member of Payson Operating.  In February 2011, Payson Operating was licensed by Texas as an oil and gas operator; Payson and Payson

Operating began their oil and gas operations and investment solicitations at that time.  All of
their operations were in Grayson County, Texas.

14.     From 2011 to November 2013, before launching the 3 Well Program, Payson
offered and sold two other, smaller drilling programs.  The first involved the drilling and
completion of a single well, the Brown #1.  Payson completed the Brown #1 in June 2012.  In its
second project, the Payson Petroleum Grayson 2 Well, L.P., Payson raised funds to drill and
complete two wells.  Payson completed the wells in October and November 2013.

**B.     THE 3 WELL PROGRAM'S PARTNERSHIP INTERESTS WERE SECURITIES.**

15.     The purpose of the 3 Well Program was to drill, complete, and operate three wells
in Grayson County, Texas.

16.     To raise funds for this program, the Griffins orchestrated a two-phase offering of
units in two limited partnership issuers.  The limited partnership Payson Petroleum 3 Well, LP
("PP3"), commenced the first phase of the offering on or about October 23, 2013 and closed the
first phase on December 31, 2013.  The limited partnership Payson Petroleum 3 Well-2014, LP
("PP3-2014"), commenced the follow-on second phase of the offering on or about January 1,
2014, and closed the second phase on June 30, 2014.  The Griffins offered the units in two
phases solely for tax-minimization purposes. A syndicate of SEC-registered broker-dealers
assisted Payson in offering and selling the interests.  The firms were paid a sales commission.

17.     Collectively, the two limited partnership issuers offered a maximum of 1,000
units, with the Griffins representing to investors that Payson would purchase 200 of those units.

18.      Working through Payson, the Griffins offered investors a choice of purchasing
units in the 3 Well Program offering as either limited partner interests or general partner
interests.  The Griffins' decision to offer this choice was driven exclusively by tax

considerations.  Indeed, the 3 Well Program offering materials expressly stated that all general

partner units would convert to limited partner units upon the completion of the three wells. (That

conversion occurred on September 11, 2015, once the wells were completed.)  Despite the sale to

many of the investors of general partner interests, neither the Griffins nor the investors ever

intended for investors to function as general partners, i.e., with management responsibility.

Rather, the Griffins and investors understood that the investors would remain passive players in

the 3 Well Program, with no role in its management or operation.  The partnership agreements

incorporated in the 3 Well Program offering materials expressly stated that the managing general

partner, an affiliate of the Griffins and of Payson, would exercise full control over all of Payson's

operations.

19.     The 3 Well Program investors were numerous, geographically dispersed, lacked

expertise in oil and gas operations, and had no prior relationship with each other and no means of

identifying or contacting one another to communicate about their investments.  The investors

were thus wholly dependent on the efforts of the Griffins, Payson, and Payson Operating to

generate profits.  Consequently, even though general partnership interests were purchased by

many investors, none of the parties expected investors to play a general partner role in the 3 Well

Program, and in fact, they did not play such role at any time.

## C.     THE GRIFFINS PREPARED THE OFFERING MATERIALS FOR THE 3 WELL PROGRAM, WHICH CONTAINED NUMEROUS MISREPRESENTATIONS AND MISLEADING OMISSIONS.

20.     The Griffins reviewed and authorized the private placement memoranda

("PPMs") Payson used in the offers and sales of the PP3 and PP3-2014 partnership interests.

21.     The Griffins had experience preparing and reviewing PPMs for oil and gas

drilling programs.  M. Griffin, when he was employed as a registered representative with Lone

Star Securities, reviewed many PPMs for oil and gas projects.  W. Griffin, in the operation of his separate company, drafted and reviewed many PPMs.

22.     In  reviewing, authorizing and disseminating each of the two PPMs to prospective 3 Well Program investors, the Griffins, acting through Payson, had ultimate authority over the content of the PPMs and whether and how to communicate those contents.  They were therefore the "makers" of the factual statements in the PPMs.

23.     Both PPMs contained material misrepresentations and misleading omissions.  For example, Payson reiterates in each PPM that it will purchase, for a total $5.4 million, 200 of the 1,000 available units in the 3 Well Program.  The PPMs spell out that this $5.4 million co-investment by Payson was 20% of the total $27 million Payson said it needed to fund fully the drilling and completion of the three wells ($24 million) and to cover the other costs of the two-phase offering ($3 million).  The Griffins were the source of the PPMs' representations about Payson's co-investment.  They believed that Payson's putting at investment risk $5.4 million of its own funds would attract investors to the 3 Well Program.  In webinar slides prepared by the Griffins and viewed by investors and the brokers selling the units, Payson's $5.4 million co-investment was referred to as "skin in the game."

24.     According to the Griffins, Payson's promise to contribute 20% of the capital for the 3 Well Program was designed to distinguish Payson from other oil and gas promoters which typically receive, without putting up additional consideration (other than their services as operator), a carried interest in production revenue.  In contrast, the Griffins represented to the investors that, in the 3 Well Program, Payson was putting its own money at risk of loss, and thereby aligning itself with the investors in looking to production revenue from the wells for a return of its $5.4 million principal, and, beyond that, a profit. In reality, Payson put up no money.

25.     When they launched the 3 Well Program, and during the entire time Payson was offering and selling the investments, the Griffins knew that Payson's financial situation was desperate and that Payson did not have the financial wherewithal to perform the promises it was making, *i.e.*, the promise to co-invest $5.4 million, and to pay any cost overruns.  The Griffins did not disclose to the investors Payson's financial plight; nor did the Griffins clarify that Payson lacked the cash reserves or access to capital to purchase the 200 units it claimed it would purchase.  Likewise, the Griffins did not disclose that Payson lacked the financial resources to pay for any cost overruns in developing the wells.

26.     Notably, as of September 30, 2013, the month before they began offering and selling the 3 Well Program, Payson had only $58,722 in its bank account.  Payson's audited financial statements, which the Griffins had knowledge of as Payson's officers and directors, evidenced its dire condition.  Its audited financials for 2011, 2012, and 2013, respectively showed year-end net losses of $352,742, $496,655, and $1,566,984.  In fact, Payson's auditor noted that Payson's losses and deficits put Payson's ability to continue as a going concern in doubt.

27.     The Griffins reviewed Payson's 2011 and 2012 audited financial statements and were aware of this financial information as they prepared the PPMs for the 3 Well Program. Specifically, the Griffins reviewed Payson's 2011 and 2012 audited financial statements.

28.     Although Payson's 2013 audited financial statements were not finalized until June 26, 2014 – four days before the second phase of the offering closed – the Griffins reviewed an unaudited Payson balance sheet and statement of income, as of September 30, 2013.  The balance sheet and statement showed, as of September 30, 2013, a net loss of $616,272, a cash position of only $58,722, and an accumulated deficit of $1,139,106.

29.     The Griffins and Payson did not disclose any of this material financial information to prospective or actual investors.

30.     Moreover, the Griffins did not disclose to the investors Payson's actual benefit from the 3 Well Program.  The Griffins intended from the outset that Payson would retain $24 million (net of the actual well costs) of the presumed $27 million raised in the offering as its putative "drilling fee."  This was never disclosed to the investors.  More particularly, the Griffins knew that Payson had executed contracts with PP3 and PP3-2014--the two limited partnership issuers they formed--to drill the 3 Well Program for a fixed price of $24 million.  In each PPM, this $24 million is mischaracterized as the "estimated" cost of the three wells.   In fact, the sum was a fixed contractual fee, not a mere "estimate," a term which misleadingly implies variability and that any cost savings, *i.e.*, drilling and completing the wells for less than $24 million, would inure to the investors' benefit.  It actually cost between $16 and $18 million to drill and complete the three wells, not $24 million.  Neither the limited partnership issuers, nor the investors themselves, received back any portion of the difference between the $24 million "estimate" and the wells' actual cost.

**D.     PAYSON RAISED $23 MILLION WITHOUT CONTRIBUTING ITS PROMISED SHARE.**

31.     Through the use of the misleading offering materials, Payson raised $23 million from approximately 150 investors geographically dispersed across the country.  After the offering closed on June 30, 2014, Payson continued to mislead the investors.  E-mails from Payson's Director of Public Relations to the investors announced that Payson had raised the full $27 million, leading investors to believe, mistakenly, that Payson had contributed its $5.4 million share to the 3 Well Program.

32.     The brokers selling the 3 Well Program were also misled.  The Griffins wrote checks on Payson's bank account, totaling $4.36 million, to the limited partnerships, but funded those checks almost entirely with the investors' own money.  The checks, which were furnished to the chief compliance officer of the managing seller of the 3 Well Program, a securities brokerage firm, made it appear that Payson had made its financial contribution to the 3 Well Program with its own funds.  In fact, the checks were drawn on the investors' funds.

E.     PAYSON'S BANKRUPTCY.

33.     On June 10, 2016, Payson and Payson Operating both filed for protection under Chapter 7 of the Bankruptcy Code.  The filing was later converted to a Chapter 11 filing, to allow the bankruptcy trustee to conduct plugging and abandonment procedures on Payson's wells, as required by the State of Texas.  The bankruptcy trustee has projected that, after administrative expenses, neither company will have funds available to pay its unsecured creditors.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations of Section 17(a) of the Securities Act

34.     The Commission repeats and re-alleges Paragraphs 1 through 33 of the Complaint as if fully set forth herein.

35.     By engaging in the conduct described herein, Defendants directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce or of the mails:

(a)     employed devices, schemes or artifices to defraud;

(b)      obtained money or property by means of untrue statements of material fact or

omissions to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and

(c)      engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon purchasers of securities.

36.      With regard to their violations of Section 17(a)(1) of the Securities Act,

Defendants acted intentionally, knowingly or with severe recklessness with respect to the truth.

With regard to their violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act,

Defendants acted at least negligently.

37.      By engaging in this conduct, Defendants violated, and unless enjoined will

continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q].

<u>**SECOND CLAIM**</u>
<u>**Violations of Exchange Act 10(b) and Rule 10b-5 thereunder**</u>

38.      The Commission repeats and re-alleges Paragraphs 1 through 33 of the Complaint

as if fully set forth herein.

39.       By engaging in the conduct described herein, Defendants directly or indirectly,

singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the

mails, or of the facilities of a national securities exchange, in connection with the purchase or

sale of securities, knowingly or recklessly:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; and

(c)      engaged in acts, practices, or courses of business which operated or would operate

as a fraud or deceit upon purchasers of securities and upon other persons.

40.     Defendants engaged in this conduct intentionally, knowingly or with severe recklessness with respect to the truth.

41.     By engaging in this conduct, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## VI.
## RELIEF REQUESTED

For these reasons, the Commission respectfully requests that the Court enter a judgment:

(a)     Permanently enjoining Defendants and their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly Section 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), §77e(c), 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

(b)     Ordering Defendants to disgorge, jointly and severally, all ill-gotten gains and/or unjust enrichment realized by each of them, plus pay prejudgment interest.

(c)     Ordering each Defendant to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

(d)     Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

(e)      Granting all other relief to which the Commission may be entitled.

Dated:  November 23, 2016.                    Respectfully submitted,

                                              */s/ Janie L. Frank*
                                              Janie L. Frank
                                              Texas Bar No. 07363050
                                              SECURITIES AND EXCHANGE COMMISSION
                                              Fort Worth Regional Office
                                              Burnett Plaza, Suite 1900
                                              801 Cherry Street, Unit #18
                                              Fort Worth, TX 76102-6882
                                              (817) 978-6478 / (817) 978-4927 (facsimile)
                                              *frankj@sec.gov*

                                              COUNSEL FOR PLAINTIFF SECURITIES AND
                                              EXCHANGE COMMISSION